Roberts, Jr.: We have our argument next this morning, Case No. 15-1189, Impression Products v. Lexmark Int'l. Mr. Pincus. Pincus, Jr.: Thank you, Mr. Chief Justice, and may it please the Court. This case brings before the Court two questions regarding the patent exhaustion doctrine, also known as the first sale doctrine. As this Court said in Bowman, under that doctrine, the initial authorized sale of a patented item terminates all patent rights to that item, and by exhausting the patentee's monopoly in that item, the sale confers on the purchaser or any subsequent owner the right to use or sell the thing as he sees fit. That principle goes back, of course, to the 15th century. The common law refused to enforce restraints on alienations of chattels based on the fundamental insight that you own the goods that you buy and you should be able to do with them what you wish, and that clouds over title hurt the marketability of goods and injure commerce, and importantly, in the patent context, allowing these downstream restrictions to be enforced would preempt secondary markets with which to check the patent owner's monopoly power. Let me begin with the first question, which is whether the authorized sale of an article embodying the patent exhausts patent rights with respect to that article, or whether the patentee may impose restrictions enforceable under the patent laws, such as on resale, repair, or reuse, simply by stating such a restriction in the sales agreement. The Court's description of the patent law remedies apply. The Court's description and application of the doctrine for more than 150 years makes clear that such restrictions cannot be enforced under the patent law. Not only the patent law. Kennedy, are there other examples of really important rules that have not been codified? Why hasn't this been codified? In the Patent Act, Your Honor? Too busy or what? Well, I think that there were a number of patent law rules that Congress didn't codify fully or either at all in the 1952 Act. This was one. The Court in the contributory infringement area, for example, has looked to pre-1952 law to flesh out the details of contributory infringement that the Congress didn't specify. Does the failure to codify mean we should be somewhat cautious in extending and extending it? Well, I don't think there's a question about extending it. I think the Court's enunciation of the rule in the cases prior to 1952 was very clear and specific. So I think it was — there's really no doubt that when Congress enacted the law in 1952, it did so with the knowledge that there was the principle that I've recited and the Bowman recitation is consistent with many, many decisions of this Court dating back to the 1800s that say the same thing, that when there is an authorized sale, the patent rights are exhausted. The Court said in some cases the article falls out of the patent laws and all that applies is State law. And most importantly, the Court's sole decision upholding these sort of restrictions, A.B. Dick, was expressly overruled a few years later in the motion picture patents case. So we not only have the Court's consistent enunciation of the doctrine, we have the fact that there was this deviation and then an immediate correction. So — Sotomayor, besides contributory negligence, what other patent ideas were not codified? Pincushion The Misuse Doctrine, I don't believe, was codified initially, although there have been some subsequent amendments that have done that. Other patent defenses, there were — there were years, for example, as the government points out in its brief, between the 18 — the late 1800s and 1952, there was no infringement that wasn't explicitly referenced in the Patent Act. But everyone knew that the common law rules, the rules that have been developed under prior statutes, continued to apply and that there was a remedy for infringement and what its contours were were specified by the Court's prior decision. So it's an area where there is a lot of the work has been done by adapting and incorporating these prior decisions. Alito The Federal Circuit's rule on this is 25 years old. Has it caused a lot of problems? Pincushion Well, the Federal Circuit's rule is old, but it's been subject to dispute both when this Court decided Quanta and then again when the Court decided Bowman. Most commentators, as we discussed in our briefs, and some lower courts, believed that the rule had been displaced. Even at the time it was decided, as some of the amicus briefs point out, commentators were skeptical that it could be reconciled with this Court's rule. So the practice in industry, and this is discussed in the medical device reprocessors brief, for example, in the Intel brief, were counseling their clients not to abide by, not to take action based on this rule because it was quite suspect. In recent years, as the Intel brief, amicus brief points out, there have been efforts now to take action based on the rule, and it is causing problems in this global supply chain circumstance. Alito, it seems counterintuitive that patent holders would pursue that if the court that's going to get every patent case has adopted a particular rule, and they're just, would you advise your client, well, just disregard that? Pincushion Well, I think what we, what people were advising their clients was don't impose restrictions based on the idea that they can be enforced because there's a good chance that they can't be enforced. So many restrictions were not being imposed, a few were. Of course, this is very similar to the situation the Court confronted in Kurtzang, where the Court said there, there was a 30-year rule that hadn't been questioned at all by decisions of this Court, and the Court said the fact that people hadn't acted obviously wasn't a predictor of what would happen if the law was clarified by this Court.  So I think this is a very similar situation to the one that was presented in the amicus briefs, and would indeed expand patent monopoly rights far beyond anything that anyone has thought possible under this Court's precedents. Let me briefly talk about the lower court's decisions where it went astray. There were two basic justifications. One was statutory. The Federal Circuit assumed that the exhaustion doctrine was grounded in the without authority clause in Section 271A, and that, therefore, Congress had given the patentee a veto over the scope of the exhaustion rule. We think that's not correct. This Court's prior cases prior to 1952 didn't indicate at all that exhaustion was a question of the patentee's authority, rather a flat rule. And the Court's exhaustion, we think, is best looked at in either of two ways, either as a limit on the 152A rights, the rights to exclude that are set forth, and what the Court has indicated is that they're a limit on the scope of the patentee's right to exclude. Also, the 1952 Act included in Section 282b-1 a section called defenses that set forth defenses that could be pled, and one of those defenses was absent of liability for infringement, thereto an obvious incorporation of the preexisting exhaustion doctrine. The Federal Circuit's second rationale confused two concepts, the ability of a patentee to set the terms for a first sale and the ability to impose post-sale restrictions. We think it's quite clear that just as a patentee can decide for itself who it will sell to, it can impose as a condition of licensing, manufacturing, and sales by others those same restrictions. It can restrict who the licensee can sell to just as who it can decide who to sell to. But in either case, whether the sale by the patentee or the sale by the licensee, post-sale restrictions are invalid as long as it's an authorized sale. Any sale by the patentee is, of course, authorized. In the licensee context, there's an additional inquiry, did the licensee abide by the terms of the license? If it did, then the sale is authorized and no post-sale restrictions can be enforced. Let me turn, if I may, to the second question, the question of international exhaustion that this case raises. We think that the starting point here is, again, Congress's incorporation of this Court's statements regarding the exhaustion rule. In other words, the Patent Act should be read as if there were provisions stating the initial authorized sale of a patented item terminates all patent rights to that item. There's certainly nothing in the Patent Act that limits exhaustion to sales by U.S. patentees within the United States. Alito, it's somewhat surprising to me that none of the briefs in this case talk about our cases regarding extraterritoriality. In recent years, we've been we've said very that a statute does not apply outside the United States unless it says that it applies outside the United States. I don't see why that shouldn't be the same for a common law rule like the rule here. And if what's involved here is the application of U.S. patent law abroad, where is the clear statement that the exhaustion rule applies outside of the borders of the United States? I don't see where that can be found. Pincus, your Honor, I don't think this is a question of extraterritorial application any more than the issue in Kertsang was a question of extraterritorial application of the Copyright Act. The question here is whether the patentees' acts outside the United States have an impact on its ability to enforce its rights within the United States. So that no one is saying that the sales outside the United States are governed by the U.S. patent law. They're obviously not. Just as the sales outside the United States under the Copyright Act are not governed by the Copyright Act. But the question here is whether, if there is an authorized sale outside the United States authorized by the U.S. patentee, whether that should have the same exhaustion consequences as a sale within the United States. And we think the rationale of Kertsang and the broad rule that the Court has enunciated dictate that the conclusion here should be, yes, the same exhaustion rule should apply. In fact, it seems to us that the consequences that the Court pointed to in Kertsang not only do we have an enunciation of a non-geographic rule and the support of the common law non-geographic rule that the Court identified in Kertsang, but the adverse consequences that the Court pointed to are even more dramatic here because of the fact that patented articles are often combined into other goods through a global supply chain. And as a number of the briefs talk about, just think about a situation where a phone is assembled in China with patented chips sold from Taiwan, a screen from China, and hundreds of other patented components from all over, all of the sales of those components consummated outside the United States. The consequence there that would be that if that final phone is sold into the United States, all of the sellers, resellers, and users of that phone would be subject to patent infringement liability if the U.S. rights were not expressly licensed, U.S. rights for sale, not expressly licensed for just one patent in that huge agglomeration of patents that were embodied in that object. Same for a car assembled in Canada. The car example that the Court used in its opinion in Kertsang applies equally here. An ignition from Germany, a brake system from the United States, everything sold and put together outside the United States, and then the car brought into the United States, a risk of patent liability. And here the risk is even greater because there is no fair use doctrine to moderate the application of the rule. Patent liability, as the Court knows, is a strict liability offense with no exceptions. And we have the additional problem in the patent context of patent assertion entities that the Court has referred to that are unconstitutional. Breyer. The argument, the other side, which I think this is a more difficult part, I absolutely see your point. In both instances, whether you win or the other side wins, we're talking about something that happened where there was a lawsuit in the United States and there was a restriction that the patentee imposed. He said anyone who buys my widget cannot resell it to Smith or Jones, or anyone who buys my widget, if they resell it, has to put a big red sign on it, some kind of restriction. If somebody fails to do that, so they sue likely in the United States, but in any case, they're suing under American law, right? Yes. Either way, they're suing under American law, and this person has violated the patent or he hasn't violated the American patent. Now, when we start talking abroad, you are quite right, I think, that Lord Cook and his great principle of no alienation on chattels is being laughed at. All right, that's your argument. But on the other side, they have just received money for that first sale under, let's say, a German patent. And they have not received any money on this American patent. So they say, well, how could you be subjecting us to a rule that that first sale exhausted our right to money under the American patent when we never received any money under the American patent? Now, what is so there's one thing one way, and there's one important thing the other way. So how do you react? Well, my reaction is that in many of the contexts in which this issue arises, it's really not quite right that the U.S. First of all, just to be sure we're on the same stage, these are all sales that are authorized by the U.S. patentee. So at the end of the day, the U.S. patentee has control over whether or not. All sales were authorized. In the one sale, it was sold in Bavaria under a German patent. And not only was it authorized by the American, but he said, I love it. And so what I want you to do is whenever you use it, you put a big red sign with my name on it. All right? There's a condition. And so the question here, I think what your question goes to is, do sales in foreign countries under different laws allow the U.S. patentee to recoup the value of his patent? Oh, I'm saying do sales under foreign laws in foreign countries, that's the question. Once there has been such a sale, does the patentee still have the right under his patent to recoup the value of that particular widget bought by the buyer in Bavaria? And our submission is no. I know your submission is no, and I'm just trying to get your answer to their argument and saying, whatever you think of the U.S., there's a big difference here. They haven't gotten any money back on that. And that's why I was talking about their whether or not they had gotten the argument on the other side, I think, is we haven't gotten the value we would get if we sold our product into the U.S. So there are a couple of answers to that. First of all, in the global supply chain context, which is where most of these situations arise, the fact is the sales may take place of the components in a particular country, but they're part of a huge supply chain that's flowing to produce finished goods that are then going to be distributed to a large number of companies. Companies that sell or that either license their patents or sell components into that supply chain know full well that this is a global chain and that they are not getting value that's country-specific. They're getting a value that is essentially the average of the value in all the places where the patent is going to be used, because that's what they should demand, because that's, in fact, the market into which they're selling. The end-use product is a different situation. There certainly are products, just as the books in Kurt's saying, that are being sold into a particular market. And I think there are a couple of answers to that. One is, A, there are non-patent constraints, packaging, labeling, contract requirements that may ameliorate the ability of those products to be trans-shipped into the United States. B, there are lots of different things that go into whether or not someone gets, how much value one gets in the copyright context, for example. Although the legal rules may be more even, the enforcement of copyright principles varies dramatically in different markets, as does the wealth in different markets, and that affects how things can be sold. And lastly, as the Court pointed out, so I think there are constraints that protect the U.S. patentee in being able to demand the value attributable to the U.S. patent. But lastly, as the Court said in Kurt's saying, price discrimination may not necessarily be something that's guaranteed under the patent laws, at least as they're currently written. Congress could change that. Sorry. Sotomayor, I've heard, I've read and re-read that argument that the patent holder is not receiving value for its German patent, but the value that you receive, I think, is in the embodiment of the patent. And the whole concept of the first sale doctrine, in my mind, is that the value is whatever you get for that product. And whether you have a U.S. patent or a German patent or whatever patent, you're still getting value for that idea, for that discovery, for that whatever creative moment that you had that results in this final product. So I'm not quite sure I understand the question of this, you know, you haven't received value for the German patent. I agree with you, Your Honor. I think you have received value. And because we're hypothesizing a situation where the U.S. patentee is authorizing the sale, ultimately, the U.S. patentee can decide it's not worth my while to sell my product in Germany if the risk of transshipment outweighs the benefit. That's an economic calculation for the patentee. Sotomayor, I will say that there are counterarguments on policy questions here of – on both sides. I mean, there are serious issues about this rule and its consequences. How do you address all the negative consequences that your rule appears to be creating? Well, I think the principal negative consequence that my friends on the other side in Naramiki point to is this question of price discrimination, and I think we've talked about that. Another issue that's raised in some of the briefs is safety, food, drugs, and medical devices. As the briefs discuss, the FDA has full authority to prevent imports under 21 U.S.C. 381 of devices and to regulate reuses of devices and drugs. So broad authority where there are those risks in the safety areas. Another argument that's made on the other side is that there will be a disruption of settled expectations for the reasons – I don't think those expectations are legitimate, but if they are, because I don't think the rule has been settled on international exhaustion, but this – unless this Court is going to not be able to overturn decisions of the Federal Circuit, the fact that the Federal Circuit has decided something can't be sufficient to tie this Court's hands in doing that. If you look at the Alice case, for example, that obviously had tremendous implications for – both for patentees and for people who had entered into license agreements and were paying money for patents that turned out to be invalid, but that was just a consequence of this Court getting the law right. So I don't think on the policy level there's a lot on their side. And I think Congress can address those issues if there are specific problems. I'd like to reserve the balance of my time, if I may. Roberts. Thank you, counsel. Mr. Stewart. Mr. Chief Justice, and may it please the Court. I'd like to address the domestic exhaustion issue first, and I'd like to begin by responding to Justice Kennedy's question about why hasn't the exhaustion doctrine been codified. The Court's historic cases in the domestic exhaustion field have located the exhaustion principle in the language of the predecessors of what is now 35 U.S.C. 154a1. That is the provision of the Patent Act that says the patent owner has the right to exclude others from making, using, selling, offering for sale, or importing the patented invention. And in addressing predecessor versions of that language, this Court said those exclusive rights, in essence, don't encompass the right to control, resale, or use of a lawfully sold article. For example, in Bower v. O'Donnell, the Court said, addressed the proper interpretation of the exclusive right to vend. And it said the right to vend was exercised when the first authorized sale was made. The right to vend does not encompass the right to set resale prices. In motion picture patents, the Court said that its task was to determine the meaning of Congress in enacting the predecessor version of 154a1. In other cases, the Court has referred to lawfully sold articles as being no longer under the protection of the Act of Congress, or that the exhaustion rule delimits the scope of the patent grant. So it's true that the Patent Act doesn't contain an analog to 17 U.S.C. 109a, which is the Copyright Act provision that specifically addresses the scope of exhaustion. But the exhaustion doctrine has historically been understood by this Court as a gloss on the exclusive rights conferred by 154a1 and its predecessors. And unless Congress wanted to change the exhaustion rule, either to give get rid of it entirely or to substitute some different triggering event, there was no need for it to amend, to codify an explicit exhaustion provision. By continuing in effect and by tweaking the exclusive rights conferred by the grant of a patent, Congress should be understood to have manifested its intention that historic conceptions of domestic exhaustion would continue to have sway. Now, the second point I'd make about domestic exhaustion is that the court of appeals error, in our view, stemmed to a large extent from its misreading of general talking pictures. General talking pictures dealt not with a — not with simply a restriction on the use that purchasers could make after an article had been lawfully sold. It dealt with the conditions on which its — a patentee's licensee could sell the article in the first place. And the exhaustion doctrine is also often referred to colloquially as the first sale doctrine. And I think that's a reason — there's a reason for that. It's that the presence or absence of exhaustion turns on whether there has been a lawful first sale. And if the licensee departs from the instruction of the patentee and sells the article in a way that is not authorized, there's no lawful first sale and, therefore, no patent exhaustion. But once the article has been lawfully sold, any restrictions on resale or use that the patentee purports to impose downstream can be enforceable only under contract law or commercial law, not under patent law. And that brings me to my third point about domestic exhaustion, which is one of the reasons that the Respondent's side is that application of domestic exhaustion principles here would prevent parties from reaching agreements that might be economically advantageous to both of them. And so the Respondent says, well, if I have a particular buyer who only wants to use the cartridge once and doesn't want to pay extra for the privilege of reusing it if he never intends to do that, why shouldn't we be able to negotiate a deal under which I charge him less in return for his commitment to only use it once? And the answer is, nothing in the exhaustion doctrine prevents parties from reaching those agreements and enforcing them as a matter of contract law if they are enforceable under the law of the relevant jurisdiction. The policy judgment that this Court has historically attributed to Congress is not a judgment that these sorts of restrictions are bad or should be unenforceable. It's simply a judgment that possession of a patent doesn't give the patentee any greater rights to make or enforce restrictions like this than a seller of similar unpatented property would have under the rules of general contract law. And so in several of the exhaustion decisions, the Court has distinguished between the limits on patent remedies and the alternative remedies that might be available under what the Court has often referred to as the general law, the body of contract and commercial law that applies to all sellers. I'd like to turn now, if I may, to the question of international exhaustion and the position of the United States on this issue is between that of the two parties. It's our view that a patent – a U.S. patent owner who sells good – patented goods abroad should be able to reserve its U.S. rights but needs to do so expressly. And I'd like to start… Kennedy, can they put a sticker on the product? Well… If they do not sell, this would be a great boon to the sticker business. I do want to be careful to limit the – to make clear the limits on the principle that we're advocating. That is, we're not advocating a rule under which simply by manufacturing and selling overseas, the patentee could impose continuing downstream restrictions on the use of the good once it has been legally imported and sold into the United States. That is, under our view, if Lexmark had said, we'll sell you these cartridges in Canada and you are authorized to import them into the United States and sell them in the United States, but they are still for one use only and you need to put labeling on the package warning your consumers, one use only, in our view, that restriction would be no good, because there would be authorized importation into the United States, authorized sale in the United States, and at that point, the Court's domestic exhaustion cases would kick in. And so the patentee's choice on our view of international exhaustion is all or nothing. He can say, I don't consent to importation into the upcoming… Justice Kennedy's question, I mean, Lord Cook had that very question in mind, I think, that one of the problems with the restraints and alienation of chattel is that the buyer may not know, and moreover, it stops competition among buyers. Those are the basic two things that have led that as a kind of underlying principle. Well, what about it? Does he have to put a sticker on every toy? Does he have to put a sticker on how? How does it work? Stewart. Again, as I say, if what we are talking about is a sticker that warns, if the product is sold in Germany and the patentee wants to warn consumers in Germany, they can only use the product in the following way. He can put the sticker on, and whether it's enforceable, and if so, by what means, is a matter of German law. So in other words, the answer is yes, every widget has to have a sticker. No, the answer is, as a matter of U.S. law, the legality of the importate the original act of importation will be governed on our view by whether the patentee has explicitly reserved its right to resist importation. Breyer. I mean, you don't have to – I don't understand. Where does he reserve this right? It's a right that he wants to enforce against Joe Smith, the consumer, who bought from a German grocery store 14 patented and bouncing fountain pens. Okay? Now, that's who he wants to enforce it against, that person who comes back from Germany into the United States, and that person says, I do not know what you're talking about. You say, don't worry. There had to be an express reservation, so the question, I thought, was where? Is it a sticker or not? Typically, I think it would be an express reservation in the sense of a ban on importation. And so the express reservation would be communicated to the buyer. You could additionally require that. Here, and how would it be communicated to the buyer? Well, the initial buyer from the U.S. patentee would enter into a contract with the U.S. patentee, and presumably it would be done. And you agree you're for that, but that is very much contrary to what 300 years of restraints on alienation had in mind. One of the problems was that people who buy these things, namely those who go into the grocery store or whatever, don't know that they can't bring it back to the U.S., or they don't know that they can't do this, or they can't do that, or have to have the red sign or whatever. And you don't have an answer to that, I take it. Well, if you wanted to — first, at a certain level, anyone who buys patented products takes the chance that the person who sold those to him has no authority to do so or has transgressed the limits of his authority. And so if the patentee's buyer, the direct purchaser, was told no importation and that business in Germany then conveyed the goods to a consumer and failed to pass along to the consumer the restriction on importation, then that's not different in kind from the chance that the consumers take regularly that there is something wrong with the chain of patent title that the initial authorization was not good. What is the basis for this compromise position? Is this just a balancing of the policy considerations on both sides? I mean, it's partly policy-based, but it has, to the extent that there has been a rule in the lower courts, this has been the rule for the last hundred years. Patentees have the capacity to reserve U.S. rights but must do so expressly. Thank you. Roberts. Thank you, counsel. I'm sorry. Thank you. Mr. Trelaw. Thank you, Mr. Chief Justice, and may it please the Court. We agree with the government, at least in one sense, and that is that Judge Toronto's opinion for the Federal Circuit properly looked to the statute to find the origins and limits on the exhaustion doctrine. The Patent Act defines how patent rights can be acquired, what they cover, and how they're infringed. And as to infringement, the statute provides that infringement occurs when someone makes, sells, uses, offers to sell or imports into this country a patented article without authority from the patent owner. Now, there's been a lot of talk about authorized sales exhausting patent rights, but you have to ask yourself, unauthorized sale of what? When a patentee sells a product without saying anything about it, normally the under the normal understanding is, well, you're selling everything you have. But there's no decision of this Court that says that a patentee necessarily has to sell everything he has. The going back as far as the Mitchell case in the 19th century, it's clear that there can be conditional transactions and conditional in the sense of restrictions on use. The restriction there was a temporal one. You can have this machine and you have the right to use it until the original patent term expires, and then somebody else has the right and you're an infringer after that. There was a mention of general talking pictures, and I think that's a good starting off point. There are different ways that patentees can convey their right, their exclusivity rights or authority, to do what they have the exclusive right to do. And the two most prominent ways are, of course, licenses and sales. Now, it's undisputed that when a patentee conveys patent rights without an associated product, that is, in a licensing transaction, the parties are free to agree to buy as much or as little of those rights as they want. They can divide it up geographically. They can divide it up by field of use. That's general talking pictures. They can divide it up temporally. That's Mitchell. But when patent rights are conveyed with a product, we're told, the parties lose that freedom. They have to sell all or nothing. Now, the government adopts that position domestically, but not for foreign sales, and I'll turn to that in a moment. But I want to highlight why this matters at a policy level. Conditional or limited sales and licenses play an important role in furthering the Patent Act objectives of fostering innovation and disseminating innovations to the public. And a good starting point for that is, in January, the Department of Justice and FTC issued new licensing guidelines, and those guidelines say this, field of use, territorial, and other limitations on intellectual property licenses may serve pro-competitive ends by allowing the licensor to exploit its property as efficiently and effectively as possible. Now, the amici give some examples of why this is so. The law and economics professors, for example, give the example of a microchip that has a variety of potential uses. It could be used in a powerful computer. It could be used in a video camera. It could be used in other applications. Now, the result most consistent with the goals of the Patent Act is for that new technology to be used wherever it's useful, wherever it would increase consumer welfare. But if you cannot have use restrictions that are enforceable downstream, that's not going to happen. Roberts. Why is normal contract law and normal State law inadequate for your purposes? Well, here's why, and actually I was just getting to that, Mr. Chief Justice. In the microchip example, the logical or the economically rational outcome, if you can enforce these restrictions, is to sell at a price that makes sense for the video camera maker, at a higher price that will make sense for the computer maker, because they're using more of the capabilities of the new technology. But if you can't, if your only remedy is contract and you can't enforce these limitations downstream, well, then what happens is the video camera marketed chips are going to be, you know, there's going to be an arbitrage and they're going to be flow into the computer market. Why can't you enforce the contract downstream? Well, because you don't have privity, Justice Breyer. That's why. So why don't you require the person who sells it to just resell it with the requirement that they promise not to, you know, whatever it is? Well, and that's in effect what happens here. But then you're talking about downstream, who knows how long, and it's not practical. Breyer. One of the reasons that it's hard to get away with that is the antitrust laws in the contract area. And another reason is because Lord Cook said 300 years ago, you know, it's getting to a lot of trouble when you start trying to restrict this buyer who's got the widget and he would like to use it as he wishes. Now, that's been a kind of basic legal principle for an awfully long time. Well, let me comment on that, because it's certainly true that that's what Lord Cook said in the 17th century. But there are a couple of points I would like to make about that. One is what Lord Cook said in the quote that's in the Kirtzang opinion, for example, is that when someone sells his whole interest, he can impose no restraints because his whole interest is out of him. What we're talking about here is not selling your whole interest. The whole interest is the reserved. And I think that's a very important question. I see your point there. If you want to continue to make it further, go ahead. Go ahead. Finish, because I think I interrupted you. Oh, well, that's your prerogative, of course. What we're talking about here, of course, is not selling the whole interest. The whole interest in a patented article is both the title, so to speak, to the physical material and the bundle of rights that go with it. The other thing I would say on the Lord Cook issue and the 300 years of common law, Justice Breyer, is that the common law changed a lot after Lord Cook. In Kirtzang, the important issue was, was there a geographic restraint that Congress should be assumed to have adopted or have rejected, and the common law in the 17th century was fine for that purpose. But as Judge Taranto's opinion for the Federal Circuit points out, as a number of the amici point out, common law evolved quite a bit after the 17th century, both in this country and in England, in particular with respect to restraints on alienation of chattel, both patented and non-patented. There are quite – I mean, I agree that there are all kinds of exceptions. But to go back to your basic point underlying this, of course, any monopolist, including a patent monopolist, would love to be able to go to each buyer separately and extract from each buyer and user the maximum amount he would pay for that particular item. Dentists would pay more for gold, perhaps, than someone who wants to use gold for some other thing. Okay? They'd like that. But by and large, that's forbidden under many laws, even though it does mean slightly monopolist. All right. Now, it's against that background that I think the law and economics professors, who are telling what is correct, that – and the argument that you're making has to be evaluated. That's why I think on the first part, all this precedent is very hard for you to get around, and I'm not talking about just Lord Cook. I'm talking about the Supreme Court precedent. Well, and on the Supreme Court precedent, let me go back to general talking pictures, which I started to talk about a few minutes ago. It's clear that a patent owner can limit the licenses it grants. For example, there it was, the patent owner granted a license, basically said to the licensee, you can have the home market. I'm reserving the commercial theater market for myself. And now the government's and Impression's position is, well, as long as the licensee sold to somebody who said he was going to use it in the home market, that's an authorized sale, and then if that person or somebody further down uses it in the commercial market, that's not a problem. But the question is, and this goes back now to Mitchell, Mitchell said nobody can convey more than they have. That's why in Mitchell, the licensee could not convey the right to continue to use the patented machine after the expiration of that first period, because it's not a right that he had. The same is true of the licensee in a general talking picture scenario. He could convey the right, he could basically convey authority to use it in the home market, and that's what the patentee was compensated for in that sale, but he could not convey a right he didn't have, which is to use it in the commercial market. So that and that right was retained by the patentee. He was not compensated for it. And yet, supposedly because there was an authorized sale, there's no infringement. And that's why I say you have to ask an authorized sale of what? It's the physical product along with the particular rights that may accompany that the patentee has agreed to release with respect to that particular article. Now, the – there's a concern, and Justice Breyer, you expressed it, I think other members of the Court have expressed it, about sort of the unwitting consumer who doesn't know that they're buying a product that, you know, that were perhaps some of this authority was withheld. That's really – that has actually nothing to do with exhaustion doctrine one way or the other. That is, and I think Mr. Stewart made the point, that's really a consequence of strict liability for patent infringement. Any time anyone buys a product, when you buy a – you buy a Samsung smartphone, to take a recent example, you know, you're assuming maybe to the extent anybody outside of this room actually thinks about whether patent rights might or might not apply to an article, maybe you're assuming that it's – to the extent there are patents, nobody – you know, everybody has authority to do what they're doing, but it's only an assumption. You have no reason to – to know that you are not infringing a patent, and frankly, I think most consumers don't care because those claims are not brought against consumers. And unlike the copyright area where there's at least a theoretical possibility of criminal liability, there's no counterpart under the Patent Act. So – and that's particularly true here, because here somebody who gets a cartridge from Impression, a remanufactured Lexmark cartridge from Impression, has no reason to think it started with Lexmark. So to the extent that their exhaustion would enter into anybody's thinking, they have no reason to think, well, I'm good because this – there was a first sale of this cartridge by – by Lexmark. It's got an Impression sticker on it, and to the – so to the extent they're thinking about it, they should be thinking the same as anybody who buys a knockoff product thinks. I may be infringing, but it's cheap, so I'm not going to worry about it. So the – this – the downstream concern, I think, is not a practical concern because it doesn't happen. Patent litigation is too expensive, and most commercial enterprises don't want to go around suing consumers, and it's not a function of exhaustion law in any event. The risk is there, and it's not avoidable. The – let me turn to the foreign issue, and – and here we agree with a lot of the premises of the government's argument. And the government said one thing in their brief. This is at page 27 of their brief, and it's – it's, I think, really sums it up. It said that U.S. patentee is entitled to one premium for forfeiting his exclusive right under U.S. law to prevent the sale of his patented article in the United States. And that's really been the premise of the exhaustion doctrine, that the notion is that the authorized sale of a patented article, putting to one side what authorized sale means, lifts the legal restraints that otherwise would limit what the owner of the article could do with it, causing the article to no longer be within the bounds of the patent monopoly, a phrase that we hear in a lot of the cases. And the proceeds of that sale are the patentee's reward for lifting those restraints. That reasoning doesn't work for sales outside the United States. The sale doesn't lift any legal restraints that otherwise would have limited what the buyer could do because the U.S. patent has no force overseas. And it's not – the article is not coming out from under the monopoly of the U.S. patent because it wasn't in it to begin with, again, because the U.S. patent has no force overseas. And so the – it's in that sense, Justice Sotomayor, you asked about why isn't the patentee receiving his reward. That's why, because there are two – if you're assuming patents in the two countries, first of all, they may or may not cover exactly the same thing. Unlike copyright, there's a lot of variation. But there are two bundles of rights, and the patentee is giving up one in Germany, I think was the example, and being compensated for that, but not giving up the other one, because the other bundle of rights really has nothing to do with that transaction. Roberts, what about the argument on the other side about the complexity of, you know, products with literally thousands of different patents, and if you're allowed to impose restraints down the line, it just gets too complicated, and the consumer will be violating the patents all the time without knowing it? Mr. Chief Justice, I think, first of all, again, to the extent we're talking about consumers, the comments I made before, I think, apply no matter where the product started. But this notion of concern about tracing the provenance of these – of all these components, it exists under anybody's rule, because under the government's rule, of course, you'd have to have an express reservation, so you've got to figure out whether there was an express reservation. Under Impression's rule, everything hinges on an authorized first sale somewhere of each and every one of these components, an authorized – a sale authorized by each and every one of these supposedly thousands of patentees. So if you're – let's not use, say, consumer, but let's say you're a U.S. producer of some sort of a product that has all these components, and you really are concerned about patent – potential patent infringement liability, well, you have to go through this tracing exercise anyway and figure out whether you have to, you know, find out whether everybody was licensed or what the terms of the license might be or not. Well, there are – there are – there are Nike two things. One, they say, look, people have authorized dealers, and anyone who's in business knows you want to be safe, buy it from an authorized dealer. That isn't a big problem. On the other hand, if you are a consumer and you're new to it, it isn't – I don't think I followed quite what you're saying. If there is a first sale rule, you know, first sale, no problem. Your only problem is you bought it from a guy who didn't have a patent in the first place. So buy it from GE or buy it from Amazon or buy it from somebody you know you trust. And that's the end of that. But if there is no first sale rule, there we are. Got to have the red sign, got to have can't sell it here, can't sell it there, can't sell it some other place. Who knows what the – now, that's the kind of confusion, and of course, there is no sticker. That's the kind of confusion that they're afraid of. Justice Breyer, I don't – I don't think that that is the real problem. If you're buying from an authorized dealer, sure. You know, I buy an Apple iPhone from an Apple store. What I know is, well, Apple is not going to sue me for infringing Apple's patents. And because I trust Apple, I trust that they've gotten authority from the thousands of other folks, but it's only an assumption. And so you may have some peace of mind, but to truly have certainty, you've got to do this tracing exercise anyway. And that actually brings up another point, and this is a point the government made, and this applies both to consumers and to commercial operators. Of course, there are a lot of protections against this concern about infringement liability. The UCC 2-312 basically is a warrant – any time a merchant sells something, he is warranting to his customers that it does not infringe. So there's a warranty remedy there, and also, you know, the authorized dealer presumably will stand behind that. In addition, as the court of appeals noted, and I should take a step back, this case does not involve any unknowing parties. The stipulated facts here are that every one of Lexmark's counterparties knew the terms and agreed to the terms in a valid and enforceable contract, and that were licensed for single use only, and that that use had already occurred. So on the facts of this case, you don't have that. And as Judge Taranto noted for the Federal Circuit, to the extent that you're worried about downstream so-called innocent consumers or merchants, you also have issues besides the UCC, there are bona fide purchaser doctrines and other protections, even if you engage in the unlikely assumption that claims would actually be pursued. Sotomayor, how about the point raised by your adversaries that having different rules with respect to copyright and patents will make, will complicate the checking, because many products have both copyright and patent? There is no question that there are different rules. There are a host of different rules for copyright and patent. And one point I would start with, Justice Sotomayor, is that the scope of copyright protection, although the remedies may vary from country to country, the scope of the protection is virtually identical in all the countries of the Berne Convention, which is virtually all of them. That is, you don't have to guess about what is or is not subject to the copyright. You know patent protection is very different. There are inventions, software inventions, for example, can't be patented in some countries. They can in others. The scope of patent protection is very different from country to country. So there are already a host of differences. The duration, you know, copyright duration is, I think, 70 years plus the, after the death of the author, for example. Patent protection, of course, is much more limited in time. It's also easier to identify, because you have examination requirements, these, you know, registration requirements. You don't have any of that with copyright. So there already are a host of differences. And in the marketplace, they're dealt with in the same way. What we know from the amici on both sides here, particularly the ones with the global supply chains, Intel and SanDisk on the impression side, IBM and Qualcomm on the, on our side, they do, they get global licenses to protect their, themselves, their, their counterparties, consumers. That's the way it's done. It's done that way for copyright. It's done that way for patent. And, and I think IBM made this point particularly clear in, with respect to the international area. Qualcomm addressed both international and domestic. You would be upsetting settled expectations, particularly in the international area, if you adopt either Impression's rule of automatic, mandatory exhaustion that you can't even contract out of, or the government's rule that has the expression exhaustion requirement. Because, I think IBM put it, there are hundreds of thousands of contracts that have been entered into based on the Federal Circuit's ruling in JASPHOTO, which was, which was unquestioned of, since 2001. And, and even Intel and SanDisk say, yes, we, our, our contracts reflect this. So, I, I think there, this is a particular area to move cautiously, because what you're talking about here are, you know, international trade matters, where the Impression rule would essentially put the United States, basically the United States would be saying unilaterally, blanket international exhaustion is great, let's do it. Do we care if other countries reciprocate? Apparently we don't, because we're just willing to do it, because we're good guys. That's not the way international trade issues like that should be decided. On the domestic side, Qualcomm and others make the case that, in fact, parties have been relying on this. The, in the, the biopharmaceutical and, and pharma briefs, they point out that they rely on this in terms of providing research quantities of new compounds to universities and others. There, there's the, there can be a difference between the human and veterinary markets for certain compounds, and allowing conditional sales and conditional licenses to, to be enforceable via patent law facilitates that sort of dispersion of the technology, which in turn fosters innovation beyond that first level of innovation. So, I think the, this notion that nobody was, was doing these sorts of things because they weren't sure this was the law, it, it's, it's not factually true. We, we know that from the amici. And also as a matter of common sense, you, you really, I think if you're a, a patent owner and you really want to exploit your invention and you've got Federal Circuit precedent saying you can do it, the fact that somebody, the fact that maybe later down the road, even if you thought there was some doubt, later down the road that this Court might say, well, no, you can't do that, it, that's not going to dissuade you from doing it because it's not going to make it illegal. It's just going to say, well, we thought it would work and it didn't work. So this notion that nobody was doing this because of uncertainty about the, the Federal Circuit precedent in this area, I think is implausible. Now, let me talk a little bit more about the government's position on express reservations of U.S. patent rights in the, in the foreign area. Now, besides disruption of settled expectations, what that would do is it would basically insert U.S. patent law into every transaction involving any sort of product that might be covered by U.S. patent rights. Under that express reservation rule, if BMW, a German company that has U.S. patents, wants to sell a load of cars to a distributor in Slovakia, well, they need to negotiate about and include in that contract, apparently, a reservation of their U.S. rights, because otherwise if those cars somehow make their way into the U.S., they're unprotected. Even if they wanted to sell one car to a buyer in Munich, they presumably would have to do that because otherwise they're, they would be exposed if that car makes its way to the U.S. So that doesn't, there's no reason why U.S. patent law or U.S. patent rights should even enter into the thinking of parties who are entering into arrangements overseas with, with no intention or expectation that they're going to find their way to the U.S. And that approach would also make the enforceability of U.S. patent rights dependent on, really, on the whims of foreign governments and on the details of foreign law. If the reservation of rights is a, a term of a foreign agreement, and I think that's, that's where Mr. Stewart ended up, Justice Breyer, in response to your questions, well, it's going to be governed by foreign law. And for all we know, it may or may not be enforceable as a matter of the law of that particular foreign country. And we know that certain countries, and India is an example that's been given, will do things like impose mandatory licensing requirements on patent, foreign companies partner with local companies. If, if a new express reservation requirement is announced, there's every reason to think that other countries may take steps that, that undermine or make it very difficult for U.S. patentees to, in fact, protect their rights in this country. So the, and as I think some of the amici point out, if you announce such a rule, sophisticated U.S. companies, to the extent they can, consistent with, with foreign law, will reflexively probably include it in their contracts, leaving only unsophisticated, smaller U.S. companies exposed, the ones that perhaps don't have expensive lawyers and, and detailed global sales operations. Let me finally turn to the, return to the question of why contract remedies aren't, aren't suitable or, or aren't adequate. And, and let me say, first of all, that in a couple of this Court's cases, and it goes back to Keillor and Hobby in the 19th century and then picked up in some other cases, there is, the Court makes the comment, after finding that a particular sale was unrestricted, the Court says, if, if the patentee wanted to protect its distributors, because these, those cases involved exclusive geographic distributors, they could have done so by special contract, but not as a matter of the inherent meaning and effect of the patent laws, or words to that effect. Now, as Judge Taranto explained, the point there was not that you could only do it by contract, and if you did it, you would have only a contract remedy. The point was that patent rights are conveyed by means of contract, and that doesn't mean that if that contract is breached, it's only a contract remedy. A license agreement is a contract that conveys U.S. patent rights, and as this Court held in Mitchell and General Talking Pictures and other cases, a violation of a license term, a contract term, does give rise to an infringement remedy. So they're not mutually exclusive, and I don't think that's what the Court meant in those passages. I think what the Court was saying is, if you want to have restrictions, you've got to make them express. Then they can be enforceable as a matter of patent law, but in those cases, there were no restrictions. Now, the, the, besides the privity problem with the contract remedy, you also can't get an injunction. And an injunction is particularly important when you're dealing with large-scale infringers, like infringement here, that gathers up the, the, the used car to just remanufactures them and then sells them on a commercial scale. A contract remedy, first of all, we don't, wouldn't have a contract remedy against infringement. We've never had any contact with infringement or with, I'm sorry, with impression other than in this lawsuit. And the, so we don't have privity. We're not going to go suing our individual customers. Not only is it bad business, but it's not a particularly efficient use of resources. The effective remedy, the remedy we got here, as to the foreign-sold cartridges at least, was an injunction, and that's the kind of remedy a patent donor needs to protect its rights. If the Court has no further questions, thank you very much. Roberts, Thank you, counsel. Mr. Pincus, you have four minutes remaining. Pincus, Thank you, Mr. Chief Justice. Just a couple of quick points. I think it's clear that what the Court was saying in the cases my friend adverted to was the only remedy available is a contract remedy in Keeler and these other  Roberts, Hobby case? Pincus, In those cases, exactly, Your Honor. And in fact, in the Strauss case, the Court talked in particular about refusing to enforce these kinds of restrictions because they've been obnoxious from Lord Coke's day to our own. I wanted to talk about this question of the risk to the downstream resellers and buyers, because it's true in patent law there always is some risk that the initial sale won't be authorized. But I think the difference between the two positions here is once there is an initial authorized sale, that's the end of the inquiry under the test that we propose. Under my friend's test, even if there is an authorized sale, if there are these other restrictions, they continue to flow down, and therefore the group of downstream users and buyers who are subject to risk becomes much, much greater. On the question of patent and copyright, I think the critical point here is not that the laws differ from place to place, but with respect to an authorized first sale, it would be very sensible to have the same rule apply for authorized, sales authorized by the U.S. rights holder overseas for both patent and copyright, because then there would be certainty that once there was an authorized sale, both the patent and the copyright rights were exhausted. And so I think that's the, with respect to U.S. rights, and I think that's the critical point there. And I think the other thing that's important to recognize in patents that is a difference is, while Lexmark is a well-known company that has brand issues to contend with in terms of the suits it might bring against its customers and downstream users, the Court has recognized, as I said before, that in the patent context, unlike copyright, we do have patent assertion entities that are under no such constraint. And the Intel brief identifies a number of lawsuits that have been brought recently by those entities against downstream resellers and users under just this kind of theory, and that's the evil that we're worried about. If the Court has no further questions, thank you. Roberts. Thank you, counsel. The case is submitted.